WATERS's Representatives *vs.* RILEY's Adm'r.—June, 1828.

B as administrator *de bonis non*, with R and W as his sureties, by order of the orphans court in 1806, entered into a joint administration bond. W died in 1810, and R in 1814. After the death of W, judgments were obtained on this bond against B, and R the surviving surety, on account of which large payments were made by R, the principal being insolvent. The real estate of W, after his death, being sold by decree of a court of equity, for the payment of his debts—on the petition of the representatives of R, claiming to recover contribution, for the payments made by him, out of such proceeds—*Held*, that they were not entitled to recover.

In the case of a joint bond, the remedy at law survives against the surviving obligor, and is lost, as against the representatives of him who first dies.

Where the remedy at law is gone, chancery will not revive it, in the absence of fraud, accident, or mistake.

The case of a bond where all are principals, has been held to be an exception to the above rule, each being equally benefited, and under an equal original moral obligation to pay the debt, independent of the bond, to which equity relates back, when the remedy at law on the bond is gone.

In the case of a surety, who is bound only by the bond itself, and is not under the same moral obligation to pay, equity will not interfere, to charge him beyond his legal liability.

It is a general principle, that a surety who has paid the debt, may compel his co-security to make contribution, or may by substitution take the place of the creditor, and acquire all his rights against the principal debtor; but he can acquire no rights, that the creditor had not, and cannot, therefore, compel a contribution by the representatives of his deceased co-security, against whom the creditor had no remedy.

Where the legislature prescribes the substance of a bond, and it is so drawn as to include every obligation imposed by the law, and to afford every defence given by it, it will be sufficient, notwithstanding it may be slightly variant from the literal form set out. Per ARCHER, J.

APPEAL from an order of *Montgomery* County Court, sitting as a Court of Equity. The petition of the appellee to that court stated, that on the 23d of November 1818, a decree was passed by the court for the sale of the real estate of *Richard Waters,* deceased, (the ancestor of the appellants,) and a trustee appointed to make such sale; who, in pursuance of the said decree, sold the said real estate for $4000, which sale was duly reported and ratified by the court at November term 1819, when the auditor was directed to state an account of the said sale, and the claims of all the creditors of the said *Waters,* which was accordingly done on the 25th of July 1820, in which the claim of the petitioner is stated, but the amount is not ascertained. At March term 1821, the said report of the auditor was ratified by the court. Prayer, that the auditor may be ordered to make a further report of the petitioner's claim, and ascertain and report to the court the amount thereof; and for this purpose a commission may issue to the auditor, authorising and directing him to take testimony touching the said claim, &c. And for further relief, &c. On the 25th of November 1823, the auditor was directed to proceed to state the claim of the petitioner; and that a commission issue to him to take testimony, &c.

The parties afterwards, on the 16th of November 1824, entered into the following agreement: It is agreed in this case that the petitioner's intestate, and *Richard Waters,* entered into bond on the 17th of September 1806, as securities for *Mesheck Browning,* administrator *de bonis non* of *John Holmes,* in the words following, to wit: "Know all men by these presents, that we, *Meshach Browning, George Riley* and *Richard Waters,* of *Montgomery* county, are held and firmly bound to the *State of Maryland* in the sum of four thousand dollars, to be paid to the state aforesaid, or its certain attorney; to which payment well and truly to be made, we bind ourselves, our heirs, executors and administrators, firmly by these presents. Sealed with our seals, and dated this seventeenth day of September, one thousand eight hundred and six. The condition of the above obligation is such, that if the above bounded *Meshach Browning* shall well and truly perform the office of administrator *de bonis non* of *John Holmes,* late of *Montgo-*

*mery* county, deceased, according to law, and shall in all re-
spects discharge the duty of him required by law as adminis-
trator *de bonis non* aforesaid, without any injury or damage to
any person interested in the faithful performance of the said
office, then the above obligation shall be void; it is otherwise to
be in full force and virtue in law." Signed and sealed by the
above mentioned obligors. The execution of which bond was
admitted. It was also admitted that the said bond was drawn
by the order of the orphans court, in the form in which it now
appears, as a joint, and not as a joint and several bond. Also
that *Richard Waters* died in the year 1810, and that *George
Riley* survived him, and died in 1814 or 1815, and that the
petitioner administered on his estate; that after the death of
*Waters,* judgments were obtained on the said administration
bond, against *Meshach Browning,* (who also survived *Richard
Waters,)* and the said *George Riley;* and that in the year 1815,
and afterwards, payments were made by the said *Riley* on ac-
count of the said judgments, amounting to $1000. That the
said *Meshach Browning* was insolvent at the time the said
judgments were obtained, and has so continued always since.
That since the death of the said *Waters* his real estate hath
been sold by a proceeding in this court against his administra-
tor and heirs at law, for the payment of his debts, under the
act of 1785, *ch.* 72; and that there is now in the hands of the
trustee upwards of $1000. The petitioner claims to be allow-
ed out of the fund one half of the sums paid by his intestate
and himself, on account of those judgments. Which is objected
to on the part of the representatives of the said *Waters.* The
Court, [*Kilgour* and *Wilkinson,* A. J.] (November term 1824.)
It seeming just, and according to equity, that the petitioner
should receive from the proceeds of the sale of the real estate
of *Richard Waters,* heretofore sold under a decree of this
court for the payment of the debts of the said *Waters,* by *Za-
dok Magruder* the trustee appointed for that purpose, the sum
reported by the auditor appointed by this court, to be due to
the petitioner as administrator of *George Riley*—*Ordered,* that
the trustee aforesaid pay over to the petitioner the sum of $1314
59, from and out of the proceeds of the said sale remaining in
the hands of the said trustee. From this order the representa-

tives of *Richard Waters* appealed to this court; and it was agreed between the parties, that if upon the final decision of this case in this court, this court should be of opinion that the petitioner's claim ought to be allowed, or that he is entitled to any relief out of the fund in the hands of the trustee, on account of the joint suretyship of *George Riley* and *Richard Waters*, or of any payments made by *George Riley*, or the petitioner therefor, or any liability therefor, that then the case shall be sent down to the county court, with such opinion of this court, and that then in the county court the parties may by a reference to the auditor exhibit any claims or off-sets on either side, so that the order may pass for the payment of such sum as shall be then due, and the court shall think just and proper.

The cause was argued at June term 1827, before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN, and ARCHER, J.

*F. S. Key*, and *Z. Magruder*, for the Appellants, contended, 1. That the bond was void, being a statutory bond, and not according to the form prescribed by the act of 1798, *ch.* 101, *sub ch.* 3, *s.* 11, *sub ch.* 5, *s.* 6, not having the words "not already administered," inserted in the condition as required. 2. If the bond was not void, all remedy at law against *Waters*, ceased at his death, and equity, (he being only a surety,) will not enlarge the *legal* liability.

On the *first point*, they insisted that the form of the bond, as prescribed by the act of 1798, *ch.* 101, *sub ch.* 3, *s.* 11, to be given by an executor or administrator; and by the 5 *sub ch.* of that act, *s.* 6, to be given by an administrator *de bonis non*, had not been pursued in the bond in this case; nor were there any words used which were substantially the same as required by the act to be inserted—"not already administered." The bond also is a joint one, when it is contended it should have been joint and several. The bond is considered void, not having the words "not already administered;" and it is insisted that the words *de bonis non* do not supply the defect or omission, even although *Latin* may be used instead of *English*. They referred to 3 *Am. Dig.* 72, which cites *Rhodes v Vaughan*, 2 *Hawk's N. C. Rep.* 167. *Morgan v Blackiston*, 5 *Harr.*

& *Johns.* 61.  *Shivers v Wilson, Ib.* 130.  They also referred to the act of 1798, *ch.* 101, *sub ch.* 14, *s.* 11, to show that a representative of a security in an administration or testamentary bond, could not call for counter security.

On the *second point*, they cited *Ludlow v Simonds,* 2 *Caine's Cas.* 57.  *Harrison v Field,* 2 *Wash. Rep.* 138.  *Thomas v Frazer,* 3 *Ves.* 399.  *Simpson v Vaughan,* 2 *Atk.* 31.  *Bishop v Church,* 2 *Ves.* 101.  1 *Pothr.* 245.  *Williams v Hodgson,* 2 *Harr. & Johns.* 480, *(note.)*  *King v Baldwin,* 2 *Johns. Ch. Rep.* 560.  *Riggs v Murray, Ib.* 567.  *Simpson v Field,* 2 *Cas. in Chan.* 22; and the Act of Assembly of 1811, *ch.* 161.

No Counsel argued for the Appellee.

*Curia adv. vult.*

BUCHANAN, Ch. J, at this term delivered the opinion of the court.  It appears from the admissions in the cause, that on the 17th of September 1806, *George Riley* and *Richard Waters*, as sureties, entered into a joint administration bond, with *Meshach Browning*, administrator *de bonis non* of *John Holmes*, that *Richard Waters* died in the year 1810, and *George Riley* in 1814 or 1815, on whose estate the appellee administered; that after the death of *Waters*, judgment to a considerable amount were obtained on the administration bond, against *Browning*, and *Riley*, the surviving surety, on account of which large payments were made by *Riley*, *Browning* being insolvent; that the bond was drawn and executed by order of the orphans court of *Montgomery* county, in the form in which it appears, by which tribunal it was intentionally required to be "*joint*," and not "joint and several;" and that since the death of *Waters*, his real estate has been sold for the payment of his debts, under proceedings regularly instituted for that purpose.

The proceeds of which, in the hands of the trustee, are sought to be subjected to the payment of half the amount so paid by *George Riley*, on account of the judgments rendered against him and *Browning* on the administration bond, which is resisted on the part of the heirs and representatives of *Waters*.  In the case of a joint bond, the remedy at law survives against the surviving obligor, and is lost as against the representatives of him who first dies.

If then, this was a suit at law, on the bond, by those interested in the estate of *Holmes*, against the representatives of *Waters*, it clearly could not be sustained, the remedy, by the death of *Waters*, having been lost as against his representatives. Nor could chancery, in proceedings between the same parties, fix the representatives of *Waters*, with a liability which did not exist at law.    The general rule being, that where the remedy at law is gone, chancery will not revive it, in the absence of any accident, fraud or mistake; to which the case of a bond, where all are principals, has been held to be an exception, each being equally benefited, and under an equal original moral obligation to pay the debt, independent of the bond, to which equity relates back, when the remedy at law on the bond is gone.    But in the case of a surety, who is bound only by the bond itself, and is not under the same moral obligation to pay, equity will not interfere to charge him beyond his legal liability.

And surely there is no evidence here of either mistake or fraud.    The act of assembly, under which the bond was taken, does not require that such bonds shall be "joint and several," but is silent on that subject; and the admission stated in the record is, that it was intentionally ordered by the orphans court, to be drawn and executed as a joint bond.    Mistake then, there was none, since it is admitted, that what was done, whether judiciously or injudiciously, was intentionally done.    And there is as little evidence of fraud of any kind.    On whom could fraud have been committed?    Not by the parties, or either of them, upon the orphans court, because they executed the bond, under, and in pursuance of the directions of the court; and certainly not by the court itself, of which it may be proper to remark, there has not been the slightest insinuation.    And *Waters*, not having been a principal in the bond, but only a surety, the exception in relation to principals, who are under the same moral obligation to pay the debt, being equally benefited, would not reach the case.    Is there, then, in this case, any thing to enable a court of chancery to extend to the appellee any relief, to which those interested in the estate of *Holmes* would not have been entitled?    If there is, we have not been able to perceive it.    There is no doubt (as a general principle,) that a surety, who has paid the debt, may compel his co-security to make contribution; or he may, by substitution, take the place

of the creditor, and acquire all his rights against the principal debtor.    But he can acquire no rights that the creditor had not, and cannot, therefore, compel a contribution by the representatives of his deceased co-security, against whom the creditor had no remedy.   So long as the securities in a joint bond are living, the creditor has his remedy against both, and one may recover against the other a just proportion of what he is made to pay, both being under the same obligation to pay.   But if one dies, the remedy, as to him, is gone, and the duty, and the remedy both survive against the survivor; and there being nothing due from the representatives of the other to the creditor, a payment by the survivor cannot be for, or on their account, nor can it create any liability in them that did not before exist.   In such a case the surviving surety pays only his own debt, in which the representatives of the other have no concern, and his only remedy is against the principal debtor. This is just that case; on the death of *Richard Waters*, the remedy on the administration bond of those interested in the estate of *Holmes*, survived against *George Riley*, the surviving co-security, and *Browning*, the administrator and principal in the bond, with no liability resting on the representatives of *Waters*.   The payments, therefore, by *George Riley*, on the judgments obtained against him and *Browning*, could create no charge against the representatives of *Waters*, on account of debts, for which they were in no way responsible; and which could not by the creditors have been enforced against them either in law or equity.   In this view of the case, we think that the proceeds of the real estate of *Waters*, in the hands of the trustee, cannot be charged with any proportion of the sums paid by *George Riley* on account of those judgments; and that the decree ought to be reversed.

ARCHER, J. dissenting, delivered the following opinion. Two objections have been made to the decree of the court below.

1. That the bond is void, being a statutory bond, and not according to the form prescribed by the act of assembly, not having the words, "not already administered," in the condition, as required by the act of 1798, *ch.* 101, *sub ch. 5, s. 6.*

2. That at the death of *Waters* the liability was extinguished both at law and in equity.

Upon the *first* question it must be remarked, that the legislature by the act of 1798, *ch.* 101, *sub ch.* 3, *s.* 11, in prescribing the form of the condition of a bond to be executed by an executor or administrator, never intended that the form should be literally pursued, but they intended only to prescribe the substance and effect of the condition.    This section expressly declares, that the condition shall be to the following effect; and then gives the form: The *sub ch.* 5, *s.* 6, of the same law declares, that the letters, bond and oath, of an administrator *de. bonis non,* shall be in the form directed in the case of an executor, except that the words "not already administered," shall be added in the proper places.    By looking at the form of the bond, oath and letters, prescribed in the section previous to the fifth section, it will be discovered that these words could not have been intended to be inserted in the condition of the bond, there being in the words of the legislature, no proper place for their insertion.    The bond is perfect without them, by barely stating the obligation to discharge the duties of administrator *de bonis non,* instead of those of executor or administrator; and when this change in the phraseology is effected, the condition corresponds in every particular with the condition prescribed by the act.

The legislature must have intended the insertion of the words *"not already administered,"* to apply to the oath and the letters, in which alone, according to the forms they have prescribed, would there be appropriate places for the insertion of such words.

But if by any construction the bond could be considered as specially referred to, and being one of the instruments indicated as containing a proper place for the insertion of these words, I would not wish to be understood, as intimating an opinion that on the failure to insert these words, the bond would, therefore, be inoperative and void.    On the contrary, I think, that where the legislature prescribes the substance of a bond, and the bond is so drawn as to include every obligation imposed by the law, and to afford every defence given by it, it will be sufficient, notwithstanding it may be slightly variant from the literal form set out.    This is the doctrine maintained in *Rhodes v Vaughan,* 2 *Hawk's N. C. Rep.* 167, and I would adopt it here as consistent with reason and propriety.    Now the designation of

the administrator, by the name of administrator *de bonis non*, as explicitly and intelligibly defines his duties, as if it had been in so many words stated that he was to administer on *"goods not already administered."* Of course his obligations are the same, and he would be deprived of no defence he might otherwise have had.

With regard to the *second* objection, it is perfectly clear, as a general principle, that where a bond is joint, and one of the obligors die, the remedy of the obligee exists against the surviving obligor alone, and that it is extinguished against the representative of the deceased obligor; and that in ordinary cases equity will not interpose to give relief to the obligee by enabling him to pursue the estate of the deceased obligor in the hands of his representatives. But there are exceptions to this general rule, as where a bond is made joint by fraud, ignorance or mistake, in which cases equity will revive the duty. So, too, where the lending is to two, and they both have the benefit of the loan, there exists on the part of both obligors a moral obligation to pay, and equity will enforce the obligation against the representatives of the deceased obligor, although the bond be joint, and not several; as in the case of *Simpson v Vaughan*, 2 *Atk.* 33. The borrowing on the one side, and the lending on the other created, in the language of Lord *Hardwicke*, a reasonable presumption, that the bond was either, through fraud or mistake, or for want of skill, made a joint bond, instead of a joint and several bond. The original contract of lending and borrowing was that each and both should pay, and in such case the court will presume fraud, ignorance or mistake, in the change of the contract from a joint and several to a joint contract. A surety in a joint bond, not having participated in the borrowing of money, or in its original consideration, is bound to the obligee by no moral obligation whatever to pay, but merely by the legal force of the bond, and there would be nothing in such a case upon which to build an equity by which the duty as against him should be revived. These are the doctrines, as respects *obligees* enforcing obligations which are joint, against the representatives of deceased obligors.

It remains to be considered how far these doctrines can be assimilated to the cases of sureties in joint obligations claiming con-

tribution. And here it is necessary to consider upon what this doctrine of contribution is founded. It is said by the court in *Deering v Earl of Winchelsea*, 2 *Bos. & Pull.* 272, that it is founded on a principle of equity, and not on a contract; but in *Claythorne v Swinburne*, 14 *Ves.* 169, it is perhaps more properly intimated, that as it is founded in equity, all who become sureties may be considered as contracting with regard to the principle of equity, which demands contribution. It is then a principle of equity that the losses of the sureties are to be equally borne, and the contract between the sureties is in reference to this doctrine of equity. This equitable principle of contribution extends to joint, as well as several bonds, and to sureties, where even their names appear upon different instruments. *Deering v Earl of Winchelsea*, 2 *Bos. & Pull.* 270. If it be built either on the principle of equity alone, or on a contract in reference to the existence of such a principle, can the accidental death of a joint obligor defeat this equity? Sureties always having reference to this equity, rely on the contribution to lessen their responsibilities and ultimate eventual and contingent losses, and of course look to the character, solvency and safety of their co-securities, deriving from those circumstances a greater security. It is impossible to say, that if the contribution is founded in contract, that it could be defeated by the death of the co-security. And if the contribution depend not on contract, but upon equity, that such equity can be defeated by the death of one and the survivorship of the other obligor. In the case of an obligee pursuing a surety's estate, equity will not interpose, because where equity is equal the law must prevail, and the bond as to his estate is extinguished at law. Now the surety's equity is equal to the obligees—no consideration passes between them, there is no moral obligation to pay, and he is only bound by the letter of his contract. How different is the case of a demand for contribution there, there is no equality of equity if one pays the whole, in saying he must bear it. There exists between them a clear *moral obligation* to apportion the loss, to say nothing of a contract between them, which would demand the interposition of equity to lighten the burthen which has been thrown upon one of them

The obligee cannot enforce a bond extinguished at law, for he has no equity which would give it life.

The surety does not even seek to revive the bond in asking contribution of his co-security. He asks it in virtue of a consequence which has befallen him from the original signature. He does not, in any case, ask to revive it, for that could not be done; his payment alone had extinguished it. But he asks it, because it would be against conscience, that the estate of one who had entered into the suretyship with him, between whom there was a privity, and in relying on whose solvency and ability to relieve him from a portion of any burthen which might fall on him, he had entered into the bond, should be entirely exonerated.

To say that the bond was extinguished as against *Waters'* estate, does not meet the question. For the equity of the survivor, who is obliged to pay, looks to the source and origin of the transaction, and will, and ought, to coerce that original obligation that existed between them, and which is founded on the highest and clearest equity and justice.

Any contrary view must be grounded on the notion, that the sureties in the bond looked to its joint character, were acquainted with the legal principles which attached to it, and *gravely* contemplated their exoneration by death; which would be a very forced presumption, utterly inconsistent with fact, and with all those motives which experience teaches us operates upon mankind in such situations. I do not mean to assert that contribution is founded on contract; it would be sufficient to justify my view, that it has its foundation on a moral obligation. But I cannot but think, that there is much reason for saying, that it may be viewed in the light of a contract. For contribution is so obvious an equity, that every man must be supposed to look to it, and looking to it, I think it could violate no principle to say, that the sureties, in case of loss, tacitly enter into a contract to bear each a portion of the burthen. And, although it is positively asserted, that contract has nothing to do with the liability, yet, is not this doctrine clearly contradicted by the fact, that courts of law maintain actions of *assumpsit*, in which contribution is enforced? For how would such an action lie but upon the idea of a contract express or implied? If it be said that it lies on the principle of justice, or on moral obligation, this in itself will not be sufficient, unless from

such moral obligation you can infer a contract. And it will be found in *Peck v Ellis,* 2 *Johns. Ch. Rep.* 136, that the jurisdiction of courts of law in contribution between sureties, is expressly placed upon the ground of an implied *assumpsit* arising from the knowledge of the general principle, that equality is equity.

It has been correctly remarked, that "rights claimed by, and injuries arising from survivorship, are not viewed in a very favourable aspect, either at law or in equity." *Jinkins v De Groot,* 1 *Caine's Cas.* 122. And this case, it strikes me, is of all cases which could be selected the least favourable for enforcing advantages claimed to the deceased's estate from the survivorship of his co-security.

I am clearly of opinion, that the decree of the court below was correct, and that it ought to be affirmed.

DECREE REVERSED. (a.)

*(a.) Note.* Since the execution of the bond referred to in the preceding case, the act of 1811, *ch.* 161, has enacted, "That if two or more persons are jointly bound for the payment of a debt, or for the performance, or forbearance of any act, or for any other thing, and one or more of the said *obligors* die, his or their representatives may be charged by virtue of such *obligation,* in the same manner as such representatives might have been charged if said *obligors* had been bound severally as well as jointly." Upon the construction of this act—See the case of *Pike v Dashiell's Adm'r.* 7 *Harr. & Johns.* 466.